### NELSON v. VAN HORN CONSTRUCTION COMPANY et.

Common Pleas Court, Trumbull County.

No. 59110. Decided July 9, 1951.

Edward Powell, Referee, on behalf of board.
Sieman & Sieman, Warren, for plaintiff.
Otto Webber, Business Agent for A. F. of L.
Ross Watkins, Labor Foreman.
Clifford Moore, witness for plaintiff.

THOMAS, J., of Geauga County, sitting by assignment.

## OPINION
By THOMAS, J.

Plaintiff appeals from an adverse ruling of the Board of Review of the Ohio State Bureau of Unemployment Compensa-

tion (herein called the Bureau), which held that he had not established his eligibility for unemployment compensation benefits and denied him the right to receive benefits for the week ending January 28, 1950.

Plaintiff is 58 years old, has a family, and is classified as a laborer.

Prior to being laid off because of lack of work he worked for the Van Horn Construction Company of Youngstown, Ohio, as a plasterer's helper. For four or five years he had worked at the same line of work.

He journeyed to Louisiana in the latter part of July, 1950, and remainder until a week after Christmas when he returned to Warren.

In dispute are his efforts to obtain employment on and about January 23, 1950, when he applied to the Warren office of the Bureau of Unemployment Compensation. The evidence concerning this disputed period will presently be considered.

On February 8, 1950 a person connected with the Warren office of the Bureau took a statement from the plaintiff which the plaintiff signed.

It read: "I was L. O. L. W. from Van Horn plaster contractor on 7-13-49. I have not worked since 7-13-49 and have been looking for work—unable to get work.

I have made the following contacts for work in the last four weeks. Union Hall (every day). This is the only contact I make.

The above statement has been read to me and is true and correct."

February 8, 1950 the administrator disallowed the plaintiff's claim for benefits for the week ending January 27, 1950.

It found that "claimant's only contact for work in the last four weeks has been in the Union Hall" and decided that:

"Claimant is not actively seeking work. Benefit rights shall be suspended as of January 22, 1950 in accordance with §1345-6-2 (4) of the Ohio Unemployment Compensation Act. Benefit rights shall remain suspended until Claimant re-establishes eligibility by actively seeking work on his own initiative."

The plaintiff, on February 10, 1950, appealed from the administrator's decision and stated on his notice of appeal that:

"I am actively seeking work and will name the contact I have made at the hearing."

His appeal was heard on March 21, 1950, before a Referee who affirmed the administrator's decision on April 17, 1950. A memorandum testimony was made by this Referee but no stenographic record was taken.

Application for leave to institute a further appeal from the decision of Referee was granted by the Board of Review and oral testimony was taken before a Referee on June 22, 1950. A stenographic transcript of the testimony is filed with this appeal.

On August 18, 1950 the Board affirmed the decision of the Referee of April 17, 1950. The Board's reasoning in support of its decision, is here given:

"The statement given by claimant on February 1, 1950, and his testimony before the Referee on March 21, 1950, also the testimony of his witness shows that up to February 13, 1950, Claimant has not contacted any prospective employers in regards to finding employment except to report to his Union Labor Hall and at the Local Office on his claim."

"Claimant having only reported to his Union Labor Hall could not say as of January 22, 1950, the date of the beginning of his benefit year, that he was available for suitable work and was actively seeking such work. Therefore, he has failed to meet the requirements of the above quoted law. (The Board had previously quoted §1345-6-a (4).

As amended, effective October 18, 1949, §1345-6-a (4), with the introductory sentence of §1345-6-a reads—

"No individual shall be entitled to waiting period or benefits for any week unless he or she (4) is able to work and avaliable for suitable work and is actively seeking such work, either at a locality in which he has earned wages subject to the unemployment compensation act during his base period or at a locality where such work is normally performed; And"

It is essential to a determination of the questions raised on this appeal to ascertain the meaning of this fourth eligibility condition for unemployment compensation benefit rights.

In the recent case of **Shannon v. Bureau, 155 Oh St, 53, 44 O. O. 75** the Supreme Court considered the claim of a waitress whose efforts in seeking employment were limited to registering at the local employment office at the Ohio State Employment Service.

This claim accrued before §1345-6-a (4) as amended, became effective, but the Supreme Court decided the case after the effective date. The court's reference to the present language is quite important.

After referring to the amendment of October 18th, 1949 in which reference the court significantly italicized "actively seeking such work" the court went on to say:

"If the present case had arisen after the amendment of the Statute, it could not have been argued that registration alone qualified the Claimant as being available. This amend-

ment, we believe, merely clarifies and does not change the meaning of the word "available" as it appeared in the Statute previous to the amendment."

From this language it is concluded that the general test adopted in the Shannon case for determining availability is deemed, by the court, to be equally applicable to §1345-6-a (4) as presently worded. This is the general test.

To be available for suitable work and to actively seek such work "the Claimant must act in good faith and make reasonable effort to find suitable employment. Mere registration and weekly reporting, without such reasonable effort, does not satisfy the requirement of the Statute in question and does not make the Claimant 'available.' "

A sensible definition of the term "actively seeking work," consistent with the Shannon ruling, is the one given by The Missouri Industrial Commission, February 3, 1949. C. C. H. paragraph 8150 p. 28,629.

"The 'actively seeking work' proviso of the law has no fixed or defined meaning. It is subject to interpretation in the light of the facts of each particular case. This proviso is merely a guide provided by the Legislature to test a Claimant's willingness to work. What constitues an active search for work in one case may be totally inadequate in another case and vice versa. The true test is: Does a Claimant sincerely want work and has he acted in a reasonable way under his circumstances in trying to relieve his unemployment."

It is interesting to note that a similar "willingness to work" test was adopted in connection with an analogous condition of the British Unemployment Insurance Law which required the Claimant to be "genuinely seeking work."

A recognized Umpire's decision (Final Report Royal Commission on Unemployment Insurance, 1932, page 323) thus defined the meaning of "genuinely seeking work."

"In considering whether a person is genuinely seeking work the most important fact to be ascertained is the state of the applicant's mind. If a person genuinely wants work, i. e. really prefers working for wages to living on benefit, it is probable that she is genuinely seeking it. But if a person prefers benefit to wages, or is content to be without work as long as she receives benefit, it may be presumed that she is not genuinely seeking it. Action is guided by desire, and, whilst few people genuinely seek what they do not desire, most people genuinely seek what they really desire."

It should be noted in passing that England, after three years experience (1927 to 1930) with the requirement that a Claimant be "genuinely seeking work" found that it was

unworkable, repealed it in 1930, and has never re-enacted it, either in words or in substance.

Therefore it seems consistent with the Shannon ruling to conclude that an unemployed person is "available for suitable work and is actively seeking such work" if, under the circumstances of his particular case he has acted to relieve his unemployment in good faith and in a reasonable way.

It is in accordance with this definition of §1345-6-a (4) that the ruling of the Board of Review will be tested.

In finding against the plaintiff the Board of Review had to find that under the circumstances of this particular case the plaintiff had failed, in good faith and in a reasonable way, to act to relieve his unemployment.

If this finding was not manifestly against the weight of the evidence or not unreasonable or not unlawful then it must be affirmed.

But if the Board's finding was manifestly against the weight of the evidence or unreasonable, or unlawful, then it must be vacated and final judgment will be granted to the plaintiff.

First to be weighed is the conclusion of the Board, representing the first paragraph of the Board's reasoning, that

"The statement given by Claimant on February 1st, 1950, and his testimony before the Referee on March 21, 1950, also the testimony of his witness shows that up to February 13, 1950, Claimant has not contacted any prospective employers in regards to finding employment except to report to his Union Labor Hall and at the Local Office on his claim."

It is apparent from this statement that the Board places considerable stress on the testimony said to have been given by the plaintiff before the Referee on March 21st, 1950.

This is emphasized by the following sentence contained in the Board's Finding of Facts:

"Claimant testified before the Referee that on February 13, 1950 he contacted the Republic Steel Corporation in regards to obtaining employment and that was the first contact he made other than reporting to his Union Hall and reporting on his claim at the Local Office."

Examination of plaintiff's testimony on June 22nd, 1950, fails to reveal any testimony of the nature here referred to. Actually the Board is making an inaccurate reference to the so-called Memorandum of Testimony of the March 21st, 1950 hearing. The reference is inaccurate because that Memorandum states:

"Says Ravenna Arsenal 2/11/50 first place looked. Republic Steel on 2-13-50."

The Referee's cryptic synopsis of the plaintiff's purported testimony however is at variance with the plaintiff's own testimony given before a Board Referee on June 22, 1950 and recorded by a stenographer.

It does not appear that the purported testimony of March 21st, 1950 was given under oath as was the testimony of June 22nd, 1950. But in any event a verbatim record of the earlier testimony of the plaintiff was made.

To understand his testimony given on June 22, 1950, it is essential to know that The Niles Rolling Mill is owned and operated by The Republic Steel Corporation.

Q. After coming back from Louisiana did you start looking for any kind of work?

A. I went down to McDonald and I went to The Niles Rolling Mill.

Q. What was down at McDonald?

A. Steel Mill.

Q. Did you apply for work there?

A. Yes sir.

Q. How long after you came back from Louisiana did you go down there?

A. Couple of weeks.

Q. What did they tell you?

A. They were laying off men.

Q. Did you then go to any other place?

A. I went to Niles Rolling Mill.

Q. What did you go there for?

A. Went there to look for a job.

Q. Did you apply for work there?

A. Yes.

Q. What did they tell you?

A. Laying off men.

Q. How long after you came back did you go there?

A. The next day after I went to McDonald, I went there.

On cross examination by the Referee, on June 22nd, 1950, it was brought out that the plaintiff went to Niles Rolling Mill (Republic) before he went to the "Unemployment Office."

Q. Before you went to the Unemployment Office where did you go?

A. I went to Niles Rolling Mill.

Q. That is before you went to the office at all?

A. Yes.

His sworn testimony makes it perfectly clear that plaintiff's application at Niles Rolling Mill (Republic Steel) came before he reported to the Unemployment Office. Thus his application at Republic happened sometime before January

23, 1950 the date of his application for unemployment compensation.

Yet the Board totally ignores this sworn testimony.

To credit a synopsis of purported testimony, while totally ignoring sworn contradictory testimony appears to be clearly unwarranted and unmistakably against the manifest weight of the evidence.

Furthermore the Board claims that the alleged testimony of the plaintiff is

"borne out by the testimony of Clifford Moore, Claimant's witness who stated that it was the middle of February, 1950 that he first talked to Claimant after his return from Louisiana."

However examination of Moore's testimony fails to support the Board's conclusion

Q. (By Referee) Can you tell me when it was you met this man, the first or middle or the last?

A. About the middle of February.

Q. And he was unemployed and was looking for work?

A. That's right.

Q. He didn't tell you when he had been to these places?

A. That's right.

(Moore had previously testified that when they met the plaintiff had mentioned McDonald and Niles Rolling Mill as places he was looking for work.)

Necessarily Moore's testimony shows that the plaintiff had looked for work at McDonald and Niles Rolling Mill **sometime prior** to when they met in the middle of February—and not about the middle of February as the Board seems to conclude.

The Board's conclusion is further refuted by Watkin's testimony. He testifies that when they met in **January** or **February** the plaintiff told him he had previously looked for work at Niles Rolling Mill.

The Board also relies on the statement prepared by a Bureau employee which the plaintiff signed on February 1st, 1950, and which says in part:

"Union Hall (every day.) This is the only contact I make."

But on its face this statement is patently incomplete. For everyone concedes that the plaintiff was contacting the Employment Service Local Office during this period. The statement, however, makes no reference whatsoever to that CONTACT. The statement therefore cannot be taken at its face value. As the plaintiff finally said in answer to a question by the Referee "Well it couldn't have been a true statement."

The record also names other places where the Plaintiff sought work without getting work at and prior to the time he applied

for unemployment compensation on January 23rd, 1950.

A list of these places included Erie Railroad Freight Office, building construction at Vine and Market in Warren, and the Warren Garbage Agency.

The plaintiff testified that during the period in question he was physically able and willing, but was unable to find work. He cited the coal strike as one reason for slack working conditions.

Nor was his inability to get work surprising in view of the extensive unemployment then existing.

Labor Market Information (regular official publication of the Bureau's Department of Research and Statistics) reports monthly on general employment conditions throughout Ohio, and Labor Market Information (regular official publication of the Bureau's Warren Office) reports monthly on employment conditions in the area of the Warren office. The information contained in both reports are official Government Bulletins which may be judicially noticed by this court. Corpus Juris Secundum, Evidence, Section 42 at page 606 and Atlantic Transport Co. of West Virginia v. Rosenberg Bros. and Co. 34 F. 2d 843.

Under the heading "Ohio Labor Market, February 1950." Labor Market Information (Ohio) No. 13 it was reported:

Coal Crisis continues * * *

"Unemployment hit an eight-year high last month * * * highest January since 1942. Nearly 4.5 million were out of work nationally * * * 73 out of every 1,000 in labor force, according to Bureau of the Census. Better than 200 thousand job-seekers were registered with Ohio State Employment Service on first of February. No one knows how many are unemployed, but not registered."

Labor Market Information (Warren) for February 18th, 1950 reported

"Reversing the previous downtrend, employment in the Warren area has made a decided gain in recent weeks. A survey of 46 major firms shows the number at work increased around 1,165 between November and mid-January, total about 22,050. The employment rise during the 60-day interval was largely confined to the recall of persons previously laid off. Employment is still about 1,600 below the January 1949 level.

"Factories accounted for most of the job increase during the two-month period, by adding some 1,250 persons to their payrolls. The largest number of hires were reported among producers of primary metals, electrical machinery, and furniture. Small gains in non-electrical machinery and metal fabricating plants were more than offset by scattered losses in other industries. Non-manufacturers suffered slight cut-

backs—mainly in construction and transportation and utilities * * *"

"There has been an increase in the number of persons looking for work recently. On February 1, some 2,925 were seeking jobs through the Warren office of the Employment Service—about 80 more than on the first of January * * *"

"During January some 225 positions were available through the Local Employment Service Office. At the beginning of this month around 60 of the openings remained unfilled. Currently in demand are stenographers, commission salesmen, and domestic workers." (Emphasis ours.)

The record and the general employment data which properly may be noticed by this Court require the following conclusions of fact, relating to January 1950, and early February, 1950.

1. Unemployment was acute. The construction business was especially slack. The coal strike had caused lay offs. There were generally no labor jobs—the kind of work for which the plaintiff was suited.

2. Plaintiff did make reasonable efforts to get work. He contacted the Local Employment Office, his Union, and made an extensive independent search for work.

In good faith and in a reasonable way he acted to relieve his unemployment, thus establishing that he was available for suitable work and was actively seeking such work.

The Board's finding to the contrary is manifestly against the weight of the evidence.

Secondly requiring consideration is the Board's conclusion that by reporting to his Union Hall the plaintiff "could not say as of January 22, 1950, the date of the beginning of his benefit year, that he was available for suitable work, and was actively seeking such work."

On the contrary it appears that under the facts here existing his regular reporting to his Building Trades Union did constitute availability for suitable work and an active search for work.

Plaintiff worked as a plasterer's helper in the construction trade. He belonged to the A. F. of L. Union, presumably a consolidated Building Trades Local.

It is ordinarily necessary for a man in this field to endeavor to get his employment through this Union.

This was brought out in the Referee's questioning.

Q. (By Referee) "It's necessary for a man affiliated with your Union to get his work out of your office?

A. That's right."

Requests for employees come to the Business Agent from

contractors though occasionally a contractor hires a man without the Union sending the man to the contractor, it was testified.

The situation is closely analogous to the nursing profession.

It is highly impractical and inefficient for a nurse to seek employment by individually contacting every hospital, every doctor and every nursing home who may need a nurse.

Instead nurses engage nursing registries as their agents to seek employment for them. It saves useless and endless individual solicitation of jobs.

Yet surely a nurse, who registers with each available Registry is actively seeking work just as much as the nurse who personally calls every hospital, every nursing home and every doctor in town in search of work. What she does herself she may do through an agent, especially when the latter method is a far more efficient and effective way to secure nursing work.

When a worker in the construction field contacts his Union for work he is doing what the nurse does when she contacts Nursing Registries.

The building tradesman, by joining the Union, has engaged an agent to look for work for him when he is unemployed. He knows that in the construction field substantially all employment is procured through the Union. He knows that contractors who need help in most instances will call the Union for workmen.

Manifestly an unemployed building tradesman who sought out these same contractors—if the custom of the trade permitted him—would thus be making himself available for suitable work, and would thus be carrying on an active search for work.

What he may do on his own surely is no less effective if his agent does the same thing for him. Contact with contractors through his Union is the legal equal of individual contacts with those same employers.

It is, therefore, concluded that the plaintiff in continually seeking work through his Building Trades Union—which was unable to supply him with a job, made himself available for suitable work and actively sought such work as required by §1345-6-a (4), he having also, without success, continued to seek work through the Employment Service.

The ruling of the Board therefore is not only manifestly against the weight of the evidence, but it is also unlawful and unreasonable.

It is set aside and final judgment is granted the plaintiff.